*217
 
 ADKINS, J.
 

 This appeal requires us to decide whether the vehicle that struck appellant Thomas O’Quinn was a “temporary substitute” for a vehicle insured by appellee Maryland Automobile Insurance Fund (MAIF), in which case the MAIF policy provided liability coverage. The Circuit Court for Prince George’s County concluded that the vehicle was not a temporary substitute and granted summary judgment in favor of MAIF on O’Quinn’s declaratory judgment action. We shall reverse that judgment.
 

 FACTS AND LEGAL PROCEEDINGS
 

 On August 8, 1998, while Thomas O’Quinn was walking in a parking lot, he was struck by a 1996 Ford Escort driven by Mosele Kabila. O’Quinn suffered severe leg injuries.
 

 Averaging 150 miles each weekday, Kabila was an “independent contractor” for Washington Express, a courier service. In 1997, Kabila had purchased a high mileage 1988 Hyundai for $400, to use in this work. He was paid based solely on the number of routes he completed.
 

 At the time of the accident, there was a $20,000 MAIF liability policy in effect on the Hyundai. But Kabila was not driving the Hyundai on the day of the accident because that car had broken down for the fifth time. The vehicle had been smoking and would stall out, requiring towing services on two occasions. Kabila garaged the Hyundai, which was not operable, making no plans to repair it.
 

 Kabila rented the Escort two weeks after the Hyundai broke down, on June 10, 1998.
 
 [1]
 
 He wanted to buy the Escort, but did not have the money or the credit necessary to make the purchase. In order to establish credit, Kabila made rental payments on the vehicle every two weeks. Once he made a number of timely payments he could qualify to buy the Escort. At the time of the August 8 accident, then, Kabila was still
 
 *218
 
 renting the Escort. Kabila did not inform MAIF that he had the Escort until he actually purchased the vehicle in October 1998.
 

 O’Quinn sued MAIF and Kabila in the Circuit Court for Prince George’s County. He sought,
 
 inter alia,
 
 a declaration that the MAIF policy covered the Escort because it was a “temporary substitute” or “replacement” for the Hyundai described in the MAIF policy. MAIF denied coverage, citing Kabila’s abandonment of the Hyundai and his use of the rented Escort for more than 30 days. Agreeing that there was no factual dispute regarding the “rent before the purchase” circumstances at the time of the accident, O’Quinn and MAIF filed cross-motions for summary judgment on the coverage issue. The court granted MAIF’s motion and denied O’Quinn’s. This timely appeal followed.
 

 DISCUSSION
 

 The MAIF liability policy defines as a “[cjovered automobile” either the vehicle described in the policy or any of the following:
 

 3. an automobile that you acquire during the policy period provided that it:
 

 (a) replaces an automobile owned by you and described in the Declarations; or
 

 (b) is in addition to the automobile(s) described in the Declarations but only if:
 

 (1) we insure all automobiles owned by you on the date the newly acquired automobile is delivered to you; and
 

 (2) you notify us within thirty days following its delivery;
 

 4. a temporary substitute automobile that you do not own, provided that you are using it with the permission of the owner as a substitute for an automobile described in the Declarations that has been withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;
 

 
 *219
 
 5. any other automobile that you do not own, provided that it is being used by you with the permission of the owner and;
 

 (a) it is not furnished for your regular use; and
 

 (b) it is not owned by or furnished for the regular use of a member of your household other than your private chauffeur or domestic employee; and
 

 (c) it is not rented to you for a period of more than thirty consecutive days. (Emphasis added.)
 

 Maryland applies the principle of objective contract construction to insurance contracts.
 

 In construing contracts of insurance, Maryland follows the general contract rule that the agreement should be viewed as a whole to determine the intention of the parties to the contract and the purpose which they sought to accomplish. When the provisions are not ambiguous, a court should enforce them according to their plain meaning. If, however, the terms of the contract are ambiguous, the ambiguity shall be resolved against the drafter of the policy and in favor of the insured.
 

 St. Paul Fire & Marine Ins. Co. v. Nationwide Mut. Ins. Co.,
 
 79 Md.App. 734, 737-38, 558 A.2d 1244 (1989). “Although Maryland law does not construe insurance policies as a matter of course against the insurer, when a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer.”
 
 Mamsi Life & Health Ins. Co. v. Callaway,
 
 375 Md. 261, 279-80, 825 A.2d 995 (2003).
 

 As grounds for their contradictory conclusions regarding the coverage afforded by the policy, O’Quinn and MAIF both cite the undisputed inoperability of the Hyundai, its “withdrawal] from normal use as a result of its breakdown,” Kabila’s use of the Escort as a substitute for the Hyundai without notice to MAIF, his rental of the Escort for more than 30 days, and his purchase of the Escort as a permanent replacement after the accident. Each side agrees that the material facts are not in dispute; they disagree only about
 
 *220
 
 whether the policy provides coverage in these undisputed circumstances. Thus, their cross-motions and arguments reveal that summary judgment on the coverage question raised in this declaratory judgment action is a question of law for the court. When there is no genuine factual dispute, we review the grant of summary judgment in a declaratory judgment action concerning the scope of insurance coverage to determine whether the insurer was entitled to judgment as a matter of law.
 
 See St. Paul Fire & Marine Ins. Co.,
 
 79 Md.App. at 737, 558 A.2d 1244; Lee R. Russ,
 
 Couch on Insurance
 
 § 117:68 (3d ed. database updated through Dec.
 
 2003")(“Couch
 
 ”).
 

 O’Quinn contends that the circuit court erred when it ruled that the Escort was not covered by the MAIF policy, either as a “temporary substitute” under section 4 of the “covered automobile” definition, or as a “replacement” vehicle under section 3(a).
 
 [2]
 
 MAIF counters that Kabila’s rental of the Escort for more than 30 days, without notice to MAIF, excluded the Escort from coverage. More specifically, MAIF argues that subsection 3(a) does not apply because Kabila did not notify MAIF within 30 days that he was using the Escort and he did not own the Escort. Section 4 does not apply in MAIF’s view, because Kabila rented the Escort for more than 30 days, planning to buy it, so that his use of it was not “temporary.”
 

 We shall assume
 
 arguendo
 
 that the Escort is not a covered automobile within the meaning of subsection 3(a).
 
 [3]
 
 
 *221
 
 We nevertheless conclude that the Escort was a “temporary substitute automobile” within the coverage afforded by section 4.
 

 The so-called “substitution” provision is concerned with the situation where the vehicle described in the policy becomes unavailable for use for any one of a number of specified reasons, and another vehicle, not owned by the insured, is temporarily used in its place. It is not necessary that the insured still own the original automobile at the time of the use of the temporary substitute taking the place of the “destroyed” car.
 

 Couch, supra,
 
 § 117:61;
 
 see, e.g., McKee v. Exchange Ins. Ass’n,
 
 270 Ala. 518, 120 So.2d 690, 693 (1960)(substitute vehicle provision did not require insured to retain ownership of described vehicle). This type of “substitute coverage clause is for the benefit of the insured.”
 
 Couch, supra,
 
 § 117:63. The MAIF policy language is identical to the current Insurance Services Office standard automobile policies for personal and business use.
 
 See id.
 
 at § 117:61.
 

 As a threshold matter, we note that there is no debate that the rented Escort qualified as a “substitute” vehicle. We have held that, in the “covered automobile” definition of a liability policy, “[t]he term ‘substitute’ connotes the replacement of one thing for another.”
 
 St. Paul Fire & Marine Ins. Co.,
 
 79 Md.App. at 738-40, 558 A.2d 1244. And we have classified a rental car as a covered substitute under a substantively similar policy.
 

 
 *222
 
 In
 
 St. Paul Fire & Marine Ins. Co.,
 
 Patricia Caldwell rented a car after the vehicle described in her policy was damaged in an accident. She initially rented from the dealer who was repairing her car, but later arranged for a less expensive rental from Snappy Car Rental. The Snappy car was delivered to Caldwell’s home. Caldwell drove the dealer car back to the dealer, while her housemate followed in the Snappy car. En route, the housemate was involved in an accident.
 

 Snappy’s insurer refused to provide a defense, claiming that the dealer rental car, rather than the Snappy car, was the only “temporary substitute” for the insured vehicle at the time of the accident. We agreed, holding that “[t]he problem in the instant case arose because at the time of the accident, Caldwell had rented two vehicles to replace the one vehicle covered by her insurance policy” and “[b]oth rental vehicles were on the road at the same time.”
 
 Id.
 
 at 740, 558 A.2d 1244. We explained that,
 

 [w]hen Caldwell rented the car from [the dealer], it is clear that her insurance coverage ... extended to that vehicle. If Caldwell had returned the [dealer] car and thereafter rented another vehicle, that second vehicle would have been covered under her policy.
 

 Id.
 
 Here, it is undisputed that Kabila substituted only the rented Escort for the broken down Hyundai, using it for precisely the same purposes.
 

 The controversy in this case centers instead on the duration of Kabila’s use of the vehicle and his plan to purchase it. MAIF adopts a narrow construction of the undefined word “temporary” in its substitute vehicle clause. It contends that Kabila’s rental of the Escort for more than 30 days, with plans to eventually convert this rental into a purchase, prevented the Escort from being a “temporary” substitute for the Hyundai. We disagree.
 

 To the extent that MAIF’s construction of its temporary substitute provision effectively defines “temporary” as a period of less than 30 days, we reject that interpretation. In
 
 *223
 
 effect, that reading of the policy would apply the same 30 day limit on rented vehicles that appears in section 5 to all temporary substitute rentals under section 4.
 

 By its terms, however, section 5 provides coverage in circumstances “other” than those covered by the temporary substitute provisions of section 4.
 
 [4]
 
 Section 4 affords liability coverage when, as in this case, the policy holder’s described automobile is withdrawn from normal use due to breakdown. Significantly, only section 5 explicitly excludes from coverage vehicles rented for more than 30 days; the “temporary substitute” coverage described in section 4 does not include any specific limit on the duration of such coverage, much less a 30 day deadline.
 

 In our view, the presence of clear language creating a 30 day rental limitation in section 5 underscores the conspicuous absence of similar language in section 4. Read in context and
 
 in pari materia
 
 with sections 3 and 5, the temporary substitute coverage in section 4 protects a policy holder whose covered vehicle has broken down, during the indefinite time that he is temporarily driving another vehicle that he does not own as a substitute for the described automobile.
 
 [5]
 

 We therefore agree with courts and scholars who have concluded that, in the absence of a contrary definition, “[t]he word ‘temporarily’ ... does not place a time limit as to withdrawal of the insured vehicle.”
 
 Couch, supra,
 
 § 117:81. Thus, “the duration of the use is not controlling in determining whether the use is temporary.”
 
 Id.
 
 at § 80. Rather, the word “temporary” in this context has been treated with “elasticity” as “an antonym for the word ‘permanent.’ ”
 
 See id.
 
 at
 
 *224
 
 § 79-80 (collecting cases);
 
 State Farm Mut. Automobile Ins. Co. v. Johnston,
 
 9 Cal.3d 270, 107 Cal.Rptr. 149, 507 P.2d 1357, 1359 (1973).
 

 We disagree with MAIF and the circuit court that Kabila’s plan to purchase the Escort establishes that, at the time of the accident, his use of that vehicle was “permanent” rather than “temporary.” On the day of the accident, Kabila was still renting the vehicle in the hope of purchasing it, but he had no contractual right to purchase the car. Rather the record shows that Kabila was unable to do so due to lack of money and credit. Instead, he was renting the vehicle for two weeks at a time. Kabila had no contractual right to purchase the car. These facts are undisputed.
 

 In our view, Kabila’s use of the Escort was temporary in the very real sense that he was driving this rented vehicle for an uncertain period of time, until he could secure a permanent replacement for the Hyundai. Whether that replacement turned out to be the Escort or another car is not material; the dispositive fact is that Kabila was still renting the Escort on a temporary basis at the time of the accident.
 

 Construing Kabila’s use as a temporary substitute use is consistent with the policy objective underlying such coverage, which is to benefit the insured by
 

 affording] temporary coverage to the insured while he or she is using a borrowed [or rented] automobile until the automobile designated in the policy is restored to normal use. Evenhanded fulfillment of its purposes requires that the provision not be unreasonably extended to increase materially the risk contemplated by the insurer, nor should it be narrowly applied against the insured, because the clause is designed for the insured’s protection.... “The purpose of the ‘temporary substitute’ clause in an automobile liability policy is to afford continuous coverage to an insured while limiting risk to one operating vehicle at a time for a single premium, and, therefore the insured vehicle for which the substitution is made must be withdrawn from use by some overt act which would
 
 *225
 
 reasonably preclude the possibility of both vehicles being driven at the same time.”
 

 St. Paul Fire & Marine Ins. Co.,
 
 79 Md.App. at 738-40, 558 A.2d 1244 (emphasis added and citations omitted).
 
 See also Couch, supra,
 
 § 117:84 (“the temporary substitute vehicle clause provides coverage for only one substitute vehicle at a time”).
 

 MAIF acknowledges that Kabila did not use or attempt to use both the Hyundai and the Escort simultaneously. Because the single premium paid by Kabila at all times covered only a single operating vehicle, and the Escort was being used in the same manner as the Hyundai, Kabila’s use of the Escort did not increase the liability risk that MAIF assumed when it issued Kabila’s policy. Indeed, MAIF’s policy undisputedly would cover the Escort under section 3 as soon as Kabila purchased it as a replacement vehicle. Allowing MAIF to avoid liability coverage in these circumstances, then, would create an anomalous “Catch-22,” in which Kabila could not have coverage under the permanent replacement provision in section 3 due to his lack of ownership, yet he could not have coverage under the temporary substitute provision in section 4 due to his desire for ownership. Consequently, treating Kabila’s “rent before purchase” arrangement as a permanent use would result in MAIF retaining a premium for liability coverage that it did not provide.
 

 Finally, we disagree with MAIF’s contention that Kabila’s intent not to repair the Hyundai bars coverage.
 
 [6]
 
 MAIF argues that the Escort cannot be a temporary substitute vehicle because, with this type of coverage, “the objective is to
 
 *226
 
 afford temporary coverage until the automobile designated in the policy is restored to normal use.” It contends that, because Kabila had no intent to repair the Hyundai, his use of the Escort was not temporary. The policy language, however, refutes that argument.
 

 The policy, in defining a “temporary substitute automobile,” only requires that the insured use it “as a substitute for an automobile described in the Declarations that has been withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction____” There is no requirement that the automobile described in the Declarations be repaired in order for the temporary substitute automobile to qualify for coverage.
 
 See, e.g., Ambrosio v. Affordable Auto Rental Inc.,
 
 307 N.J.Super. 114, 704 A.2d 572, 576 (1998)(policy required only breakdown, not repair);
 
 Couch, supra,
 
 § 117:80 (“The temporary substitute provision does not require the replacement, or the intention to replace, the insured vehicle, but affords coverage during the remainder of the policy period where the breakdown and withdrawal of the insured vehicle is permanent in nature”).
 

 MAIF, in opposing O’Quinn’s motion for summary judgment, did not dispute O’Quinn’s assertion, supported by deposition testimony, that the Hyundai broke down, that Kabila did not use it after May, 1998, and that he kept the vehicle in his garage. These undisputed facts allow us to conclude as a matter of law that the Escort qualifies as a “substitute automobile” under the policy language. The insurance company’s risk was limited to one vehicle after the Hyundai broke down. Neither Kabila’s plan to purchase nor his intent not to repair is material. Accordingly, there is no reason to deny summary judgment in favor of O’Quinn.
 

 We therefore hold that the MAIF policy covered Kabila’s use of the Escort, given that the Hyundai had been “withdrawn from normal use due to its breakdown,” and the rented Escort was still being used as a “temporary substitute” at the time of the accident. Although we found no precedent involving this type of “rent before purchase” arrangement, we view
 
 *227
 
 our decision as a logical extension of those decisions recognizing that a rental vehicle may be a temporary substitute when used for the same purposes as a described vehicle that has broken down or is otherwise unavailable to the insured.
 
 See St. Paul Fire & Marine Ins.,
 
 79 Md.App. 734, 558 A.2d 1244;
 
 see also Ambrosio v. Affordable Auto Rental, Inc.,
 
 307 N.J.Super. 114, 704 A.2d 572, 576 (1998)(vehiele rented by insured was a “temporary substitute” for described car, which was not being used because it had become mechanically unreliable);
 
 Pahl v. Grenier,
 
 277 A.D.2d 681, 715 N.Y.S.2d 124, 126-27 (N.Y.App.Div.2000)(auto insurer had duty to defend policy holder involved in collision while driving rental car, based on evidence that rental was a temporary substitute for described vehicle while it was being repaired);
 
 A & S Trucking Co. v. First Gen. Ins. Co.,
 
 578 So.2d 1212, 1215-16 (Miss.1990)(liability policy covered rental trucks as temporary substitutes because they were being used until vehicles specified in contract were ready for delivery).
 
 See generally
 
 James L. Isham,
 
 Construction and Application of Substitution Provision of Automobile Liability Policy,
 
 42 A.L.R.4th 1145 (1985 & Supp.2004)(collecting cases).
 

 We shall reverse the judgment in favor of MAIF and remand to the circuit court for entry of a judgment in favor of O’Quinn on the coverage issue.
 

 JUDGMENT REVERSED. CASE REMANDED FOR ENTRY OF JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.
 

 [1]
 

 . There was a $20,000 liability policy in effect oil the Escort. That insurance carrier tendered the policy limits.
 

 [2]
 

 . For the purpose of automobile liability insurance, “substitute” automobiles are distinct from “replacement” automobiles. A substitute automobile may be generally defined as an automobile actually but only temporarily used in place of the specified automobile for the same purpose as the insured automobile would have been used but for its withdrawal from normal use because of its breakdown, repair, servicing, loss, or destruction.
 

 James L. Isham,
 
 Construction and Application of Substitution Provision of Automobile Liability Policy,
 
 42 A.L.R.4th 1145, § 1(a) n. 2 (1985 & Supp.2004).
 

 [3]
 

 . We note, however, that MAIF misreads the "replacement vehicle” provision in the policy when it contends that “Coverage 3 requires
 
 *221
 
 notification within thirty (30) days of its delivery[.]” Aeb8. As drafted by MAIF, only the “additional vehicle” provision in subsection 3(b) requires the policy holder to give MAIF notice within 30 days. The "replacement vehicle” provision in subsection 3(a) is followed by the disjunctive word "or” before the "additional vehicle” provision in subsection (b). The 30 day notice requirement appears only in subsection 3(b). Thus, a second vehicle can fall within the definition of "covered automobile” only if the policy holder notifies MAIF within 30 days of its acquisition. In contrast, a single vehicle that replaces a single described vehicle would be a covered automobile under paragraph 3(a) even if the policy holder did not give MAIF 30 days notice.
 

 [4]
 

 . For example, section 5 would apply if a policy holder chose to rent or borrow a vehicle even though the automobile described in the policy remained operable and available.
 

 [5]
 

 . We are also mindful that, to the extent the conflicting interpretations advanced by MAIF and O’Quinn might be said to reveal an ambiguity in section 4, we must resolve that uncertainty in favor of coverage because MAIF was the drafter of the policy.
 
 See GEICO, Inc. v. Reilly,
 
 51 Md.App. 208, 216, 441 A.2d 1139 (1982).
 

 [6]
 

 . We recognize that "summary judgment generally is inappropriate when matters—such as knowledge, intent or motive—that ordinarily are reserved for resolution by the fact-finder are essential elements of the Plaintiff's case or of the defense.”
 
 Brown v. Dermer,
 
 357 Md. 344, 355, 744 A.2d 47 (2000) (citations omitted). Summary judgment in favor of O’Quinn is appropriate here, however, because there is no dispute of material fact about intent. All agree that Kabila did not intend to repair the Hyundai and that he planned to buy the Escort as a replacement. The question is not "what was Kabila’s intent?” but rather, "did Kabila's intent bar coverage?”