**Bert M. GLASER, M.D., P.A. t/a The Bert M. Glaser National Retina Institute, Plaintiff,**

v.

**HARTFORD CASUALTY INSURANCE COMPANY, Defendant.**

**No. CIV.RDB 04–1785.**

United States District Court, D. Maryland, Northern Division.

April 4, 2005.

Kevin J Pascale, Esquire, T. Christine Pham, Esquire, Rosenberg, Martin, Funk and Greenberg LLP, Baltimore, Maryland, for Plaintiff.

George E Reede, Jr., Esquire, Lucinda Davis, Esquire, Niles, Barton and Wilmer LLP, Baltimore, Maryland, for Defendant.

## MEMORANDUM OPINION

BENNETT, District Judge.

Pending before this Court are cross motions for summary judgment filed by Plaintiff Bert M. Glaser, M.D., P.A. ("Plaintiff" or "Glaser") and Defendant Hartford Casualty Insurance Co. ("Defendant" or "The Hartford"). Plaintiff originally filed a complaint against The Hartford in the Circuit Court for Baltimore City, on May 7, 2004, seeking a declaratory judgment (Count I) and alleging breach of contract (Count II) based on an insurance contract dispute. Defendant removed this

case to this Court on June 7, 2004, pursuant to 28 U.S.C. § 1441. As this Court has jurisdiction over this action based on diversity of citizenship,[1] pursuant to 28 U.S.C. § 1332, the law of Maryland applies to this action.[2] The Hartford does not dispute that the terms of the insurance policies it provided to Plaintiff cover losses resulting from embezzlement by a former employee of the Plaintiff, but the parties disagree as to the coverage limits under the policies at issue. For the reasons stated below, the Plaintiff's Motion for Summary Judgment is GRANTED in the amount of $51,923.06 and the Defendant's Motion for Summary Judgment is DENIED.

## BACKGROUND

Glaser is a retina surgeon whose practice, The Bert M. Glaser National Retina Institute ("NRI"), has offices in Maryland and Virginia. In 1999, Plaintiff first applied for an insurance policy with The Hartford. The Hartford issued a Hartford Spectrum Business Insurance Policy to NRI for the policy year beginning August 1999 and ending August 2000. Although the policy itself did not contain coverage for employee dishonesty, endorsements that were provided as part of the policy package covered loss from employee dishonesty up to a $25,000 limit per occurrence. The Hartford provided substantially similar coverage to NRI under policies spanning the next four years—August 2000 to 2001; August 2001 to 2002; August 2002 to 2003; and August 2003 to 2004. (Pl.'s Mot. at 3, citing Ex. A).[3] It is undisputed that even though the policies generally contained similar language over the five successive policy years, the premiums varied, the levels of coverage were different, and the property covered changed. (Pl.'s Mot. at 3, 10.)

In August of 2003, Plaintiff discovered that an employee named Herman R. Lawson ("Lawson"), who began working for NRI as its Accounting and Finance Manager on June 26, 2000, had been stealing money from NRI. Over the course of three policy years (2001 to 2002, 2002 to 2003, and 2003 to 2004) NRI lost $168,493.12 due to Lawson's embezzlement. In policy year 2001 to 2002, Lawson forged checks, fraudulently used NRI credit cards, and made fraudulent payments to himself totaling $31,668.10. Using the same fraudulent means, Lawson embezzled $134,901.94 from NRI during the policy year spanning

1. Plaintiff operates The Bert M. Glaser National Retina Institute from offices in Maryland and Virginia and The Hartford's corporate headquarters are located in the State of Connecticut.

2. As a general rule, in a contract case based on diversity of citizenship, such as the case at bar, the Court must determine which state's law to apply. As Judge Young of this Court aptly noted:

"In insurance contract cases, Maryland courts generally follow the rule of *lex locus contractu*, which requires that the construction and validity of a contract be determined by the law of the state where the contract is made." *Roy v. Northwestern Nat'l Life Ins. Co.*, 974 F.Supp. 508, 512 (D.Md.1997), *aff'd* 141 F.3d 1159 (4th Cir.

1998) (citing *Nationwide Mut. Ins. Co. v. Wendler*, 796 F.Supp. 201, 202 (D.Md. 1992)); *Aetna Casualty & Surety Co. v. Souras*, [78 Md.App. 71,] 552 A.2d 908, 911 (Md.Ct.Spec.App.1988) (citing *Traylor v. Grafton*, [273 Md. 649,] 332 A.2d 651, 660 (1975)). "The *locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid." *Aetna*, 552 A.2d at 911 (citing *Sun Ins. Office v. Mallick*, [160 Md. 71,] 153 A. 35, 39 (1931)); *Roy*, 974 F.Supp. at 512 (citing *Sting Sec., Inc. v. First Mercury Syndicate, Inc.*, 791 F.Supp. 555, 558 (D.Md.1992)). *Hyde v. Fidelity & Deposit Co.*, 23 F.Supp.2d 630, 632 (D.Md.1998).

3. The terms of these policies are discussed in more detail below in the Discussion section, *infra* pp. 534–36.

from 2002 to 2003. During the 2003 to 2004 policy year, Lawson ordered NRI's payroll provider to issue one unauthorized payment to Lawson via direct deposit totaling $1,923.08. Lawson was terminated on August 8, 2003.

In February 2004, a grand jury in Baltimore County indicted Lawson, alleging that between October 2001 and July 2003 he stole money in excess of $500 from NRI. The indictment states that the theft was "pursuant to one scheme and continuing course of conduct." (Def.'s Mot. at Ex. E.) Lawson plead guilty to this offense and was sentenced to a five year suspended sentence. (Id.) In September 2004, Lawson was ordered to pay restitution to Plaintiff in the amount of $162,806.34 at the rate of $500 a month, to commence in October 2004. (Id.) Glaser submitted a claim to The Hartford seeking coverage for, what Plaintiff characterized as, seven separate losses caused by Lawson between 2001 and 2004. On February 11, 2004, The Hartford rejected the contention that Plaintiff was entitled to coverage for seven separate losses under the Policy, but tendered payment of $25,000 to NRI. The Hartford does not dispute that NRI is covered under the policies for Lawson's dishonest acts, but it contends that each instance of embezzlement by Lawson does not constitute a separate "occurrence" as defined by the policies. Instead, The Hartford asserts that Lawson's embezzlement, which spanned three policy years, constitutes one occurrence limited to coverage totaling $25,000. While Glaser agrees that each occurrence of employee dishonesty is capped at $25,000, he continues to contend that there were multiple occurrences spanning three policy years. Glaser asserts that there were three occurrences of embezzlement during both the 2001 to 2002 policy year and the 2002 to 2003 policy year and one occurrence during the 2003 to 2004 policy year. Under its interpretation of the policies' limitations, Plaintiff seeks coverage in the amount of $97,606.72.[4] Glaser moves for a declaratory judgment that the policies cover $97,606.72 of its loss and for summary judgment on its breach of contract claim based on The Hartford's refusal to pay the full $97,606.72. The Hartford has also moved for summary judgment, asserting that it is not liable for coverage over the $25,000 already provided to NRI.

## APPLICABLE STANDARDS OF LAW

### I. Declaratory Judgment

"In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). As this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, pursuant to the Declaratory Judgment Act, this Court has discretion to hear this action requesting declaratory judgment. The United States Court of Appeals for the Fourth Circuit has "held that district courts have great latitude in determining whether to assert jurisdiction over declaratory judgment actions." *Aetna Cas. & Sur. Co. v. Ind–Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir.1998). In addition, the Fourth Circuit has provided guidance on the exercise of this discretion. Declaratory judgment should not be used "to try a controversy by piecemeal, or to try particular issues without settling the entire controversy, or to interfere with an action which has already been instituted." *Aetna*

---

4. Plaintiff notes that The Hartford, after the filing of this lawsuit, paid $25,000 under the policies. Therefore, taking into account this payment, Plaintiff seeks an additional $72,606.72 in coverage under the policies. (Pl.'s Mot. at 2 n. 1.)

*Cas. & Sur. Co.*, 139 F.3d at 422 (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir.1937)). The Maryland Court of Special Appeals has noted that declaratory judgment "is appropriate for the purpose of construing an insurance policy and determining the rights and obligations of insurer and insured under its provisions." *Aetna Cas. & Sur. Co. v. Brethren Mut. Ins. Co.*, 38 Md.App. 197, 206, 379 A.2d 1234, 1239 (1977).

## II. *Summary Judgment*

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c) (emphasis added). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that only "facts that might affect the outcome of the suit under the governing law" are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Moreover, a dispute over a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court further explained that, in considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249, 106 S.Ct. 2505. In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F.Supp. 170, 172 (D.Md.1985). "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 325 (10th Cir.1967); *see also McKenzie v. Sawyer*, 684 F.2d 62, 68 n. 3 (D.C.Cir.1982) ("neither party waives the right to a full trial on the merits by filing its own motion."). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir.1983).

## III. *Maryland Law on Interpretation of Insurance Contracts*

Generally, Maryland law requires insurance contracts to be objectively construed. *See O'Quinn v. Maryland Auto. Ins. Fund*, 157 Md.App. 214, 219, 850 A.2d 386, 389 (2004). Pursuant to Maryland law, an insurance agreement is to be viewed as a whole to determine the intention of the parties and the purpose which they sought

to accomplish. *See id.* When the provisions of the insurance contract are not ambiguous, a court should enforce them according to their plain meaning. *See id.*

If the Court determines that the insurance contract is ambiguous, "the ambiguity shall be resolved against the drafter of the policy and in favor of the insured." *Id.* (citing *St. Paul Fire & Marine Ins. Co. v. Nationwide Mut. Ins. Co.,* 79 Md.App. 734, 737–38, 558 A.2d 1244 (1989)); *see also Mamsi Life & Health Ins. Co. v. Callaway,* 375 Md. 261, 279–80, 825 A.2d 995 (2003). Generally, when an insurance contract is ambiguous, a jury is to construe the language of the insurance contract and it may use extrinsic evidence to determine the intention of the parties and whether the ambiguous language has a trade usage. *See C & H Plumbing & Heating, Inc. v. Employers Mut. Cas. Co.,* 264 Md. 510, 512, 287 A.2d 238, 239 (1972); *Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 389, 488 A.2d 486, 489 (1985) (citations omitted). However, if there is no factual dispute presented by the evidence, the court may construe an ambiguous contract. *Pacific Indem. Co.,* 302 Md. at 389, 488 A.2d at 489; *see also World–Wide Rights Ltd. P'ship v. Combe Inc.,* 955 F.2d 242, 245 (4th Cir.1992) ("Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if that evidence is, as a matter of law, dispositive of the interpretive issue, grant summary judgment on that basis.").

### DISCUSSION

The parties have demonstrated a basic agreement concerning what legal theories and material facts are dispositive in this case. *See Shook,* 713 F.2d at 665. Indeed, there are essentially no facts in dispute and the case presents itself to this Court for legal and contractual interpretation. Although both parties agree that losses from Lawson's fraudulent actions are covered by NRI's insurance policies, the parties dispute the level of coverage available. Plaintiff asserts that the Hartford sold it a series of independent insurance policies over multiple policy years and that it is entitled to coverage, up to $25,000 per occurrence, under each of the three policy years during which Lawson embezzled funds. Plaintiff contends that Lawson's fraudulent acts constitute separate occurrences because he: 1) forged checks; 2) used NRI credit cards in an unauthorized fashion; and 3) directed unauthorized payroll payments into his own personal account. Defendant contends that all of these acts constitute one occurrence under the terms of the policies and that the maximum coverage of $25,000 is cumulative across all three policy years during which Lawson stole money from NRI. The two main legal contentions that the Court must examine are: 1) whether Lawson's fraudulent acts constitute one occurrence under the policies or multiple separate occurrences; and 2) whether The Hartford is responsible for coverage up to the $25,000 limit for each policy year or a total of $25,000 across all policy years. This Court must first examine the terms of the policies at issue to determine whether any terms are ambiguous.

### I. *Policy Terms*

Each insurance policy issued to NRI by the Hartford contained the following Employee Dishonesty Coverage endorsement:

The "Employee Dishonesty Coverage endorsement" reads:

A. Coverage

We will pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Causes of Loss.

1. Covered Property

Covered Property means "money", "securities", and other tangible property of intrinsic value and not otherwise excluded.

2. Covered Causes of Loss

Covered Causes of Loss means dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons, except you, with the manifest intent to:

a. Cause you to sustain loss; and also

b. Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions or other employee benefits earned in the normal course of employment) for:

(1) the "employee" or

(2) Any person or organization intended by the employee to receive that benefit.

(Pl.'s Mot. at Ex. F, Employee Dishonesty Coverage Form SS 04 42 03 00).

Plaintiff's policies also address the limits under the Employee Dishonesty Coverage provision:

D. LIMIT OF INSURANCE

The most we will pay for each Occurrence of loss under this Endorsement is the Employee Dishonesty Limit of Insurance stated in the Declarations.

The Additional Coverages are included in this Limit of Insurance.

E. OCCURRENCE DEFINITION

As used in this Endorsement, Occurrence means all loss caused by, or involving, one or more "employees", **whether the result of a single act or a series of acts.**

(Pl.'s Mot. at Ex. F, Employee Dishonesty Coverage Form SS 04 42 03 00) (emphasis added).

The limits of the Employee Dishonesty Coverage are found in The Hartford's Super Stretch Endorsement. This Super Stretch Endorsement was included in Plaintiff's policies and states:

6. Employee Dishonesty (including ERISA)

The following Additional Coverage is added:

We will pay up to $25,000 as a Limit of Insurance to cover loss from employee dishonesty. This includes ERISA coverage. This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

This Additional Coverage is subject to the provisions of the Employee Dishonesty Coverage, Form SS 04 42, with the exception of the Limit of Insurance provision contained in that form Employee Dishonesty Coverage, Form SS 04 42 is made a part of this policy whether or not Employee Dishonesty Coverage is indicated in the Declarations.

(Pl.'s Mot. at Ex. G Super Stretch Endorsement Form SS 04 74 09 01.)

The Hartford highlights language found in the Crime Common Conditions and Exclusions Endorsement, which modifies the Special Property Coverage Form, both of which were part of Plaintiff's policies. The Crime Common Conditions and Exclusions Endorsement states, in relevant part:

6. **Non–Cumulation of Limit of Insurance**

Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

7. **Loss Covered Under This Insurance and Prior Insurance Issued by Us or Any Affiliate**

If any loss is covered under this policy and under any prior canceled or termi-

nated insurance that we or any affiliate has issued to you or any predecessor in interest, we will not pay more than the highest single Limit of Insurance. We will settle such claims as follows:

a.  We will first pay the Limit of Insurance applicable under this policy subject to this policy's deductible; then

b.  If the Limit of Insurance under that prior policy is equal to or less than the Limit of Insurance under this policy, we will make no further payment; or

c.  If the Limit of Insurance under that prior policy is higher than the Limit of Insurance under this policy, we will then pay for any remaining part of the loss.

But in no event will our total payment for loss be more than would be payable under the policy with the highest Limit of Insurance. We will also apply the deductible under that prior policy to the extent it exceeds the deductible under this policy.

(Pl.'s Mot. at Ex. H, Def.'s Mot. at Ex. B, Tab 3 Form SS 04 80 03 00).

Pursuant to Maryland law, a policy term is ambiguous if it can be read to have more than one meaning. *See Brethren Mut. Ins. Co.,* 38 Md.App. at 205, 379 A.2d at 1238; *Mamsi Life & Health Ins. Co.,* 375 Md. at 279–280, 825 A.2d at 1005; *see also World–Wide Rights Limited P'ship,* 955 F.2d at 245 (A contract is ambiguous if "susceptible of two reasonable interpretations.") (internal quotation and citation omitted). "In determining the existence of an ambiguity, the language at issue should be considered not from the viewpoint of a lawyer, or a person with training in the insurance field, but from the standpoint of a reasonably intelligent layman, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, prior to and contemporaneous with the making of the policy." 2 Couch on Insurance § 21:14 (3d 1997); *see also C & H Plumbing and Heating, Inc.,* 264 Md. at 515, 287 A.2d at 240; *Brethren Mut. Ins. Co.,* 38 Md.App. at 205, 379 A.2d at 1238 (identifying similar language from a previous edition of Couch on Insurance and noting that the layman analysis described in Couch is the appropriate test to determine ambiguity); *Mamsi Life & Health Ins. Co.,* 375 Md. at 279, 825 A.2d at 1005 (stating that "[a] contract term is determined to be ambiguous if a reasonably prudent person would understand the term as susceptible to more than one possible meaning.") (internal quotation and citation omitted).

As noted above, there are virtually no disputed facts in this matter, meaning that this Court can determine the policies at issue even if some terms are found to be ambiguous. *Pacific Indem. Co.,* 302 Md. at 389, 488 A.2d at 489; *see also World–Wide Rights Ltd. P'ship,* 955 F.2d at 245. In analyzing the parties' arguments below, this Court will first examine whether the terms of the policies outlined above are ambiguous. This Court will then apply the appropriate standard, pursuant to Maryland law, to construe the policies and determine The Hartford's obligations.

## II. *The Hartford's Liability to the Plaintiff Under the Policies*

■ Plaintiff's coverage argument is that, under the terms of the policies outlined above, The Hartford is liable for multiple occurrences within a policy year because the employee Lawson used different fraudulent means to embezzle funds. Glaser argues that The Hartford must cover up to the $25,000 limit per each of the seven acts of embezzlement occurring in each of the three separate policy years during which Lawson stole from NRI. This contention essentially raises two issues.

First, there is the contractual interpretation of the meaning of the term "occurrence." Second, there is the question of the application of "occurrence" within the context of different policy terms. It is undisputed that there were different policy premiums and that there was different property coverage within the three policy years in question.

In addressing the first issue, this Court notes that The Hartford policies issued to Plaintiff define "occurrence" to mean "all loss caused by, or involving, one or more 'employees', whether the result of a single act or a series of acts." Neither party has cited a case enforcing a similar occurrence provision, pursuant to Maryland law. However, a District of Colorado case is instructive, as it interpreted an occurrence definition identical to the one at issue in this case, which it determined to be unambiguous. In *Wausau Business Ins. Co. v. U.S. Motels Management, Inc.*, 341 F.Supp.2d 1180 (D.Colo.2004), the court, quoting both the Tenth Circuit and the Third Circuit, stated that "an occurrence is determined by the cause or causes of the resulting injury." *See id.* at 1183. (quoting *Business Interiors, Inc. v. Aetna Casualty and Surety Co.*, 751 F.2d 361, 363 (10th Cir.1984); *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56, 61 (3rd Cir.1982)). The court, which was tasked with determining whether a series of acts of embezzlement were one occurrence or multiple occurrences, stated that the determinative "question is not whether the employee's various methods of embezzling were related ... but whether the cause of the loss was related." *See id.* at 1183–84. The court determined that "[t]he cause of defendant's loss was the dishonesty of one employee" and, therefore, constituted one occurrence. *See id.*

This Court finds that the same reasoning used in *Wausau Business Ins. Co.*

should be applied to the facts of this case, where, within certain of the policy years, Lawson used a number of different fraudulent means that resulted in NRI's loss. Indeed, just as in *Wausau Business Ins. Co.*, the cause of Plaintiff's loss in this matter was the result of a "series of [dishonest] acts" of one employee. *Cf. Ran–Nan Inc. v. General Acc. Ins. Co. of America*, 252 F.3d 738, 739–40 (5th Cir.2001) (holding that there are two separate "occurrences" of employee dishonesty when two independent causes exist for an insured's total loss because of dishonest acts by two employees, who did not conspire to steal from their employer, but instead acted independently). This Court similarly finds that the definition of occurrence in The Hartford policy is not ambiguous. The seven acts of embezzlement in this case do not constitute seven occurrences.

■ However, the Colorado court, in *Wausau Business Ins. Co.*, rejected the analysis of the United States Court of Appeals for the Fourth Circuit in its unpublished opinion in *Spartan Iron & Metal Corp. v. Liberty Ins. Corp.*, 6 Fed.Appx. 176 (4th Cir.2001) with respect to recovery by an insured during successive policy years. The court came to a contrary conclusion to that reached by the Fourth Circuit in *Spartan Iron & Metal Corp.* concerning whether the insured was able to recover under each successive policy year for fraudulent acts spanning those policy years.

While Rule 36(c) of the Local Rules of the Fourth Circuit states that "[c]itation of this Court's unpublished dispositions in briefs or oral argument in this Court and in the district courts within this Circuit is disfavored, except for the purpose of establishing res judicata, estoppel, or the law of the case,"[5] this Court finds that the

---

**5.** (Local Rules of the Fourth Circuit, 2005).

In *Spartan Iron & Metal Corp.*, the Fourth

analysis conducted by the Fourth Circuit in *Spartan Iron & Metal Corp.* is instructive and persuasive. In *Spartan Iron & Metal Corp.*, the Fourth Circuit found that an identical definition of "occurrence" did not "affirmatively indicate whether a series of acts included acts occurring outside the policy term." *Id.* at 178. In addition, the Fourth Circuit noted that additional policy terms, again virtually identical to those at issue in this case, concerning non-cumulation and the effect of prior insurance coverage did not "ameliorate the ambiguity in the definition of occurrence." *Id.* at 179.[6] In *Spartan Iron & Metal Corp.* the Fourth Circuit noted that the policies spanning two successive policy years were "independent contracts, in that each required a separate single annual premium to be paid ...." *Id.* at 180. Glaser's five successive policies required different premiums to account for varied levels of coverage over different property, all of which indicate that each policy was independent. To interpret the successive polices as narrowly as suggested by the Defendant would essentially render the coverage of successive policies and the payment of premiums meaningless. This Court finds that the same ambiguities identified in *Spartan Iron & Metal Corp.* are present in the Plaintiff's policies, meaning that, pursuant to Maryland law, these ambiguities must be resolved against The Hartford in favor of Glaser. *See O'Quinn,* 157 Md.App. at 219, 850 A.2d at 389. Therefore, construing the relevant policy terms, including the occurrence definition, non-cumulation provision, and the effect of prior insurance coverage section, against The Hartford in favor of Glaser, Plaintiff is permitted to recover under each successive policy during which Lawson's dishonest acts occurred.

Accordingly, this Court finds that Lawson's acts of embezzlement constitute one occurrence in each policy year. Therefore, there is a $25,000 limit per policy period. The Hartford must provide insurance coverage to Glaser up to the $25,000 limit per policy year for each successive policy year during which Lawson embezzled funds. Specifically, The Hartford must provide Plaintiff with a total of $51,923.06 in coverage: $25,000 for the $31,668.10 of loss realized during the 2001 to 2002 policy year; $25,000 for the $134,901.94 of loss realized during the 2002 to 2003 policy year; and $1,923.06 for the $1,923.06 of loss realized during the 2003 to 2004 policy year.[7]

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is **GRANTED** in the amount of $51,923.06 and Defendant's Motion for Summary Judgment is **DENIED**. A separate Order and Judgment Order will follow.

---

Circuit did not directly address whether the definition of occurrence was ambiguous in terms of recovery for acts occurring within the same policy year.

6. Even though the Fourth Circuit was applying the law of South Carolina to the insurance policies at issue, Maryland insurance law concerning contract construction is similar.

7. Subsequent to the filing of this suit, The Hartford tendered $25,000 to NRI. This payment shall be applied to the amount of $51,923.06 owed under the policies.